IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BRIAN NELSON,

    Plaintiff,

        v.

CARL MILLER,

    Defendant.

Civil Case No. 03-254-CJP[1]

## ORDER

**PROUD, Magistrate Judge:**

Plaintiff Brian Nelson, is an inmate in the custody of the Illinois Department of Corrections, incarcerated at Tamms Correctional Center. His amended complaint alleges that defendant Carl Miller, the chaplain at Tamms, refused to allow him to receive a diet that comported with the requirements of his religion, in violation of the "free exercise" and "establishment" clauses of the First Amendment, the "equal protection" clause of the Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act (42 U.S.C. § 2000cc-1), and the Illinois Religious Freedom Restoration Act (775 ILCS 35/1, et seq.). **(Doc. 33;** *see also* **Doc. 41).** A bench trial was conducted on January 7, 2008, and the parties were permitted to file written briefs. **(Doc. 71 (hereinafter "Tr."); Docs. 74 and 75).**

An understanding of the procedural history of this action is helpful to the analysis of the issues. The original complaint, filed in Illinois State court in February 2003, described plaintiff as a Roman Catholic who also follows the Rule of St. Benedict, which forbids eating "the flesh meat of any four[-]legged animal at any time." **(Doc. 2, pp. 4-5 and 14).** Plaintiff's amended complaint was filed July 17, 2006, and revolves around the defendant's refusal to authorize a diet that complied with the requirements of plaintiff's declared Catholic faith. **(Doc. 33).** The

---

[1]Pursuant to 28 U.S.C. § 636(c), upon the consent of the parties, U.S. District J. Phil Gilbert referred this case to the undersigned Magistrate Judge for all further proceedings and order of entry of judgment. **(Docs. 39, 41 and 42).**

amended complaint outlines an evolution of faith, premised upon the practice of his childhood of not eating meat on Fridays and during Lent, adding adherence to the Rule of St. Benedict regarding abstaining from eating the flesh of four-legged animals, and ending with a stricter construction of St. Benedict's Rule that bars the consumption of all meat at all times.  **(Doc. 33, pp. 3-4).**

The amended complaint does not pin any particular claim to any particular date or period within the evolution of plaintiff's beliefs.  However, on motion of the defendant, plaintiff's First Amendment "free exercise" claim based on his belief that he must abstain from eating *all* meat was dismissed because plaintiff had failed to exhaust administrative remedies, as required by 42 U.S.C. § 1997e(a).  **(Doc. 56).**  Plaintiff's "establishment clause" and "equal protection" claims regarding abstention from eating the meat of four-legged animals and abstention from eating all meat were permitted to proceed, as those claims did not hinge on the specifics of the diet.  **(Doc. 56, pp. 7-12).**  In essence, the Court concluded that plaintiff's administrative grievances could not be construed to cover the infringement of religious beliefs plaintiff did not hold at the time the grievances were lodged.  The chronology of plaintiff's evolution of faith and the varying dietary strictures are similarly relevant to analyzing the remaining claims.

In accordance with Federal Rule of Civil Procedure 52(a)(1), the findings of fact are set forth below, followed by analysis and conclusions of law.

### Findings of Fact

Tamms' Institutional Directive 04-25-101, § II(I)(1) provides: "Committed persons shall be permitted to abstain from any foods the consumption of which violates their required religious tenets."  **(Plaintiff's Exhibit 25).**  Requests for a religious diet must be in writing, giving specific details as to the applicable religious tenets involved, and confirmation from a faith representative regarding the dietary requirements is required.  **(Plaintiff's Exhibit 25, Tamm's Institutional Directive 04-25-101, § II(I)(3)).**  "Should further review be needed, the facility chaplain and the religious faith representative may interview the committed person."

2

**(Plaintiff's Exhibit 25, Tamms' Institutional Directive 04-25-101, § II(I)(3)).**

Upon incarceration in the Illinois Department of Corrections in 1983, plaintiff Brian Nelson formally designated himself a Catholic. **(Tr. 13).** In the late 1990's, plaintiff took a greater interest in his faith. **(Tr. 14).** In accordance with plaintiff's understanding of Catholicism, there are three methods of penance: giving alms, works of charity, and acts of abstinence. **(Tr. 13).** Given his situation, plaintiff reasoned that his only options were prayer and abstaining from eating meat. **(Tr. 19).** Upon arriving at Tamms Correctional Center in 1998, plaintiff requested a meatless diet on Fridays throughout the year as an act of penance. **(Tr. 15 and 17).** Plaintiff subsequently began studying about Cistercian monks and other religious orders and oblates who followed the teachings and example of St. Benedict, who was the patron saint of plaintiff's parish and school during his childhood. **(Tr. 12 and 16-17).**

Plaintiff's continued study of St. Benedict caused him to write to defendant Chaplain Miller on April 23, 2001, requesting that, in accordance with his Roman Catholic upbringing and beliefs, he be given a diet free of "flesh meat on Fridays" as an act of penance. **(Plaintiff's Exhibit 5).** Plaintiff indicated that Father Fortenberry, the Catholic priest at Tamms, supported and encouraged such acts of penance. **(Plaintiff's Exhibit 5).** In apparent recognition of prison dietary policies, plaintiff indicated he would accept a "vegetarian/religious no meat diet for all meals." **(Plaintiff's Exhibit 5).** Tamms offers only the "regular" diet (which may or may not contain meat at any given meal), a vegan diet (containing no animal or animal by-products), and some medical diets.[2] **(Tr. 148-149 and 152-153).** Due to security concerns at Tamms, which is

---

[2]Bonnie Sullivan, the registered dietician responsible for dietary services at Tamms, explained that the regular diet in 2002 included chicken, turkey, fish and a limited amount of beef, as well as animal by-products such as eggs and cheese. **(Tr. 149-150).** Pork and pork by-products have not been served at Tamms since January 1999, per the warden, "in an effort to eliminate confusion related to the use of pork." **(Plaintiff's Exhibit 24).** Starting in 2004, beef was eliminated, except for beef-soy patties and beef-soy meatballs. **(Tr. 150).** The vegan diet contains no animal or animal by-products, and there is the option to receive either diary or soy milk. **(Tr. 152 and 160).** No specifically vegetarian diet is offered, and merely eliminating all meat from the regular diet would not offer adequate, balanced nutrition. **(Tr. 151-152).**

3

a "Super-Max" facility, the diets are kept to a minimum to prevent the introduction of contraband, and to prevent an inmate's cell location from being identified by tracing the delivery of a special food tray. **(Tr. 21 and 149).**

Chaplain Miller is an ordained Lutheran minister, affiliated with the Missouri Synod, and head chaplain at Tamms since January 2000. **(Tr. 86-87).** In an effort to conform with the Institutional Directives, Chaplain Miller reviews requests for religious diets, cross-checking the inmate's declared religious affiliation to determine if a religious diet is required. **(Tr. 88-90).** Miller looks for confirmation of the religious dietary tenet "on paper"– some "church document"– as opposed to a goal the inmate is merely striving to obtain. **(Tr. 90-91).** In a memo dated May 2, 2002, Chaplain Miller denied plaintiff's request for a religious diet all the time or on all Fridays. **(Plaintiff's Exhibit 22).** Chaplain Miller explained, "there are many ways to do penance," and plaintiff was free to "choose to not eat meat . . . on Fridays." **(Plaintiff's Exhibit 22).** Miller further explained that the requested diet "is not required by the Roman Catholic faith nor does Jesus of God's Word command abstention from meat on Fridays for penance." **(Plaintiff's Exhibit 22).** The chaplain went on to suggest plaintiff read "I Timothy 4:1-5," and he referenced the New American Catholic Bible and cited biblical passages purportedly illustrating "examples of true penance." **(Plaintiff's Exhibit 22).** According to Chaplain Miller, not eating meat on Fridays as an act of penance does not appear in any scripture. **(Plaintiff's Exhibit 22).** Chaplain Miller testified that if a Christian of no specific denomination requested a special diet and cited scripture passages that supported the dietary requirement, such a diet would likely be approved, because they are not bound by the tenets of a particular denomination. **(Tr. 94-95).** If a person's personal beliefs conflicted with the traditional tenets of the religion, Chaplain Miller would look for written substantiation of the variation within that faith group. **(Tr. 96).** Plaintiff is the only inmate Chaplain Miller has ever known to claim such a religious diet. **(Tr. 93).** According to Father Fortenberry, a Catholic priest and one of plaintiff's spiritual advisors, plaintiff was the only inmate– presumably the only

4

Catholic inmate– he could recall ever making such a dietary request. **(Tr. 71-72).**

Plaintiff filed an administrative grievance on May 8, 2002. **(Plaintiff's Exhibit 1).** Plaintiff complained that, as a Roman Catholic, he was forbidden to eat "flesh meat" on Fridays and during Lent, and that non-Catholic chaplains were imposing their beliefs upon him. **(Plaintiff's Exhibit 1).** Plaintiff wanted a vegan diet on Fridays and during Lent, but he again indicated his willingness to accept a vegan diet on a daily basis for the sake of convenience. **(Plaintiff's Exhibit 1).** In support of his request for a religious diet, plaintiff cited a religious reference document and Father Fortenberry, the Catholic priest serving Tamms. **(Plaintiff's Exhibit 1).** The fact that Muslims and Buddhists at Tamms were permitted vegan diets and did not have to "eat around meat" was noted by plaintiff. **(Plaintiff's Exhibit 1).** Plaintiff offered an alternate remedy: "'<u>OR</u>' stop making special allowances for certain religions that affect all prisoners such as no pork because of Muslims!!!" **(Plaintiff's Exhibit 1).** This grievance was denied at the institutional level, and ultimately by the Illinois Department of Corrections Administrative Review Board. **(Plaintiff's Exhibits 1 and 2).**

In June 22, 2002, plaintiff lodged an institutional grievance complaining he had been denied pork on certain dates due to the ban on pork, which he attributed to favoritism toward Muslims. **(Plaintiff's Exhibit 11).** Plaintiff reiterated his religious belief that he must abstain from eating "flesh meat" on all Fridays and during Lent. **(Plaintiff's Exhibit 11).**

Plaintiff continued his religious studies and learned that there are two different penitential dietary requirements under the Rule of St. Benedict: (1) abstention from eating the flesh of four-footed animals, which most Benedictines follow; and (2) abstention from all meat, which the Cistercians follow. **(Tr. 24-26).** On July 20, 2002, plaintiff again wrote to Chaplain Miller, citing the Rule of St. Benedict No. 39, regarding the "flesh of four-footed animals." **(Plaintiff's Exhibit 6;** *see also* **Plaintiff's 17, p. 62 ("Let everyone, except the sick who are very weak, abstain entirely from eating the meat of four-footed animals.")).** Plaintiff also accused Chaplain Miller of forcing his beliefs on plaintiff. **(Plaintiff's Exhibit 6).** Plaintiff

5

asked that the question be presented to the Religious Advisory Board[3]. **(Plaintiff's Exhibit 6).**

According to the testimony of plaintiff Nelson and defendant Chaplain Miller, some requests for a religious diet are automatically granted, without providing any substantiation; for example, upon request, declared Muslims and Black Hebrew Israelites are automatically given the vegan diet. **(Tr. 27 and 91-92).** According to Chaplain Miller, this practice existed before he became the Senior Chaplain, and he has continued the practice as a courtesy, and because of his understanding of the impracticalities of preparing food in accordance with the procedures mandated by those religions. **(Tr. 91-92 and 98).** However, Chaplain Miller acknowledged that not all Muslims adhere to the dietary requirement of "halal," and he considers that their choice. **(Tr. 93; *see also* Tr. 81 (stipulated testimony of Chaplain Haqq)).** Jewish inmates are afforded a similar accommodation relative to a kosher diet. **(Tr. 105).** Miller acknowledged that in the past he has approved vegan diets for some Buddhist inmates, when a faith representative has indicated the inmate would like such a diet, and the diet was in line with Buddhism– without a precise statement that the vegan diet was a religious requirement. **(Tr. 100-102).** Chaplain Miller also noted that it is when he does not know about a particular religion that he seeks verification. **(Tr. 94).**

Plaintiff's July 2002 request to Chaplain Miller was unsuccessful. **(Tr. 27).** Plaintiff continued to appeal to Chaplain Miller, writing in August 2002 that it is his belief that eating meat on Fridays is a mortal sin. **(Plaintiff's Exhibit 21).** In support of his beliefs, plaintiff offered Chaplain Miller a letter from Father Fortenberry indicating it is "permissible & highly recommended that [any Catholic] follow the diet [prescribed by the Rule of St. Benedict].

---

[3] The Religious Practice Advisory Board is under the auspices of the Director of the Illinois Department of Corrections, and provides guidance to the Department. **(*See* Plaintiff's Exhibit 25, Tamm's Institutional Directive 04-25-101, § II(E)(1)).** In accordance with Tamms' Institutional Directive 04-25-101, §§ II(G)(2)(c) and II(G) (3)(a), the senior chaplain is supposed to keep the chief administrative officer (i.e, the warden) apprised of each request for religious activities not currently offered, and the warden is responsible for refer requests for non-traditional religious diets to the Religious Practice Advisory Board. **(Plaintiff's Exhibit 25).**

**(Plaintiff's Exhibit 8).** Father Dominic J. Roscioli, a personal friend of plaintiff and his family, wrote to Chaplain Miller in support of permitting plaintiff to eat a vegetarian diet based on plaintiff's Catholic faith and the Rule of St. Benedict. **(Plaintiff's Exhibit 9).** Father Roscioli explained that original Benedictines and modern Cistercians and Trappists are vegetarians, and Roscioli equated plaintiff's life in prison to the life of a monk "outside the walls" of a monastery. **(Plaintiff's Exhibit 9).** Father Roscioli stated: If a person truly believes that a certain diet (which is really a discipline) will lead to becoming a disciple of our Lord Jesus Christ, I pray that neither you or I would stand in the way of God's Spirit at work in that person's life." **(Plaintiff's Exhibit 9).** Chaplain Miller did not give the letters from Father Fortenberry and Father Roscioli any weight, choosing instead to rely on the religious documentation plaintiff submitted, which required one to be living in a monastery under the supervision of an abbott. **(Tr. 102-103 and 115-116).**

Plaintiff lodged a second grievance on September 15, 2002. **(Plaintiff's Exhibit 3).** Plaintiff essentially complained that Chaplain Miller denied his request for a religious diet out of ignorance, having failed to consult Father Fortenberry or the Rule of St. Benedict. **(Plaintiff's Exhibit 3).** Plaintiff explained that his religious beliefs as a Catholic following the Rule of St. Benedict forbade eating "the flesh meat of four[-]legged animals." **(Plaintiff's Exhibit 3).** In denying the grievance at the institutional level, prison officials noted that plaintiff had declared himself a "Catholic," and, per Chaplain Miller, until plaintiff can establish that he is a Cenobic monk, he will not receive the requested vegan diet. **(Plaintiff's Exhibit 3).** The grievance was subsequently denied by the Illinois Department of Corrections Administrative Review Board. **(Plaintiff's Exhibit 3).** At some point in September 2002, plaintiff's beliefs evolved to include a prohibition against eating all meat. **(Tr. 55-56).** Plaintiff does not claim that his religion requires a vegan diet. **(Tr. 57).**

In October 2002, Chaplain Miller, citing Institutional Directive 04-25-101, emphasized to plaintiff that accommodated dietary restrictions must be religious tenets– "a requirement of the

7

religion." **(Plaintiff's Exhibit 7).** In a memo dated April 1, 2003, from Chaplain Miller to Administrative Assistant Randy George regarding plaintiff's request for a "religious vegan diet" on Fridays and during Lent, Miller continued to assert that the Roman Catholic faith does not require abstaining from meat on Fridays, except during Lent (which Miller approved). **(Plaintiff's Exhibit 18).** Chaplain Miller further reasoned that because plaintiff was not a Cenobite monk, he was not required to adhere to the Rule of St. Benedict. **(Plaintiff's Exhibit 18).** Plaintiff never considered himself a Cistercian monk; rather, he merely wanted to do penance in accordance with the Rule of St. Benedict. **(Tr. 55).**

Speaking about traditional Catholicism, Father Fortenberry testified that one is only required to abstain from meat on Ash Wednesday and Fridays during Lent. **(Tr. 70).** However, Father Fortenberry considered the diet plaintiff desired to be "totally in accord with the teachings of the church," and plaintiff's sincere belief. **(Tr. 74-75).**

On April 12, 2006, at the direction of the warden and in response to a formal request, defendant Miller approved a vegan diet based on the seriousness of his religion, and that diet was further approved by the warden of Tamms. **(Tr. 83-84).** However, to this day, Chaplain Miller does not believe that plaintiff should receive a vegan diet and, therefore, except for the warden's directive, plaintiff would not be receiving a vegan diet. **(Tr. 86 and 93).**

Plaintiff testified that he weighed 161 pounds when he entered Tamms, but during the time period he was denied a vegan diet he skipped eating all meat, and his weight dropped to as low as 119 pounds. **(Tr. 40-43).** According to plaintiff, he was hospitalized three times due to his weight loss; the first time being during Lent in 2002, when he abstained from all meat, and a second time about a month and a half later. **(Tr. 39 and 43-44).** However, no documentation or medical evidence of causation was offered. In any event, plaintiff testified that he felt hungry during this time period, his bones began to protrude, he was cold, and he was depressed and anxious. **(Tr. 43, 45 and 50-51).** Plaintiff testified that in 2002, each day he walked for hours inside his cell as part of a walking meditation, as he recited the Rosary. **(Tr. 58-59).**

8

Plaintiff acknowledged that he could eat chicken, turkey, fish, eggs and dairy foods and remain in compliance with the admonition in the Rule of St. Benedict against eating the meat of four-legged animals. **(Tr. 54-55).** However, plaintiff noted that often skipping the meat on his meal tray also required skipping a substantial portion of the meal, for example when spaghetti with meat sauce was served. **(Tr. 59).** Dietician Bonnie Sullivan testified that if one eliminated the red meat, the regular diet plan still afforded adequate and balanced nutrition. **(Tr. 151).** Similarly, if all meat of four-legged animals were skipped, the regular diet would be nutritionally adequate. **(Tr. 152).** Sullivan opined that there probably was insufficient nutrition in the regular diet plan if all meat were skipped. **(Tr. 151-152).** A master menu for the spring cycle in 2004 was submitted by the defendant. **(Defendant's Exhibit 47).** Although the menu is "subject to change" and substitutions of "like items" occur, on nine days during the 91-day cycle two of the three daily meals appear to contain the meat of four-legged animals; on three of those days all three meals contain the meat of four-legged animals. **(Defendant's Exhibit 47).** There was no testimony regarding the nutritional impact of having to skip items such as spaghetti with meat sauce.

Plaintiff testified that he had asked for Catholic feast days to be celebrated, but his request was denied. **(Tr. 48).** Plaintiff desired to celebrate Christmas, the feast of St. Stephen, Easter, the feast of St. Benedict, the feast of St. Bernard, the feast of the Holy Assumption, and unspecified days of holy obligation. **(Tr. 47-48).** No evidence was presented regarding any requirements for those feasts. According to dietician Bonnie Sullivan, the only "special" meals offered at Tamms are two Muslim feast days, and Christmas and Thanksgiving. **(Tr. 156).** Plaintiff noted that Muslim feast days are celebrated at Tamms, but he is not permitted to participate, but all inmates can receive the special Christmas meal. **(Tr. 48 and 156;** *see also* **Tr. 81 (stipulated testimony of Chaplain Haqq)).** Sullivan testified that the Muslim feasts amount to little more than receiving extra fruit or an extra dessert in celebration of the end of their month-long abstention from eating lunch. **(Tr. 156-157).** With respect to the Christmas

9

meal, Sullivan indicated it was her decision that everyone could have whatever meal was served for Christmas. **(Tr. 156).**

## Analysis and Conclusions of Law

Plaintiff's First Amendment "free exercise," " establishment clause" and "equal protection clause" claims[4], and his RLUIPA and IRFRA claims are each separate and distinct. However, plaintiff makes a single assertion central to all claims, arguing that Chaplain Miller's insistence that the dietary requirement be a religious requirement, confirmed by a religious authority, is impermissible. **(Doc. 75, p. 2).** In addition, plaintiff argues Chaplain Miller applied the aforementioned requirements inconsistently and in a manner favoring the Islamic and Black Hebrew Israelite religions over Catholicism, in violation of the "establishment clause." **(Doc. 75, p. 2).**

### The Free Exercise Clause

The First Amendment to the Constitution of the United States protects the "free exercise" of religion. "An inmate retains the right to exercise his religious beliefs in prison." *Kaufman v. McCaughtry*, **419 F.3d 678, 681 (7th Cir. 2005) (citing *Tarpley v. Allen County*, 312 F.23d 895, 898 (7th Cir. 2002)).** Special diets mandated by an inmate's religious beliefs are a religious practice subject to First Amendment protection. *Hunafa v. Murphy*, **907 F.2d 46, 47 (7th Cir. 1990).**

> The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden. It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.

*Hernandez v. C.I.R.* **490 U.S. 680, 699 (1989) (internal citations omitted).**

"Prison officials may appropriately question whether a prisoner's religiosity, asserted as

---

[4]The First Amendment is applicable to the State and its employees by way of the Fourteenth Amendment. *Cantwell v. Connecticut*, **310 U.S. 296, 303 (U.S. 1940).** For simplicity, all references will be to the First Amendment.

the basis for a requested accommodation, is authentic." ***Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).** Also, prison officials may legitimately deny a request for accommodation if they determine an inmate's professed religious beliefs are insincere.[5] ***See Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).** Therefore, as a general matter, Institutional Directive 04-25-101, § II(I)(3), requiring requests for a religious diet to be in writing, giving specific details as to the applicable religious tenets involved and requiring confirmation from a faith representative (which may also entail interviewing the inmate), is appropriate. The directive does not mandate anything like the sort of test *Hernandez* decries. Nevertheless, the directive could certainly be misapplied.

"[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection." ***Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 714 (1981).** The high court recognized that the judicial system is similarly ill-equipped to resolve intrafaith differences, which are not uncommon. *Id.* **at 715.** "[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect." *Id.* **at 715-716.** Chaplain Miller's application of Institutional Directives 04-25-101, § II(I)(1) and (3) was clearly inconsistent with the principle enunciated in *Thomas*, that government is not equipped to be the arbiter of religious doctrine and personal belief. Miller engaged plaintiff in a theological debate, even after two Catholic priests confirmed that plaintiff's beliefs were consistent with Catholicism and recognized Catholic practices, even though not strictly requirements of the faith. Even in a hierarchical church, such as the Roman Catholic Church, it is certainly not up to Chaplain Miller to determine when orthodoxy becomes apostasy. ***See generally Reed v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 1988).** Nevertheless, that does not establish that plaintiff's constitutional right to free exercise of his religion was violated.

---

[5]In the case at bar, the sincerity of plaintiff's beliefs has never been questioned.

In accordance with recognized religious principles, plaintiff believes that he must perform penance by abstaining from eating the flesh of four-legged animals, and to not do so is a mortal sin. It is undisputed that plaintiff's belief is sincere. Therefore, plaintiff's need to abstain from eating the flesh of four-legged animals on all Fridays and during Lent qualifies as a "central religious belief or practice."

Relative to whether a "substantial burden" has been imposed, plaintiff argues that he "was forced to choose between skipping foods that every other prisoner could eat– by 'eating around' the meat he was served– or violating the tenets of his religious beliefs by eating the meat." **(Doc. 75, p. 6).** Plaintiff further contends, "The test is not whether the requirement imposes a substantial burden on [his] diet or health. The issue is whether the requirement imposes a substantial burden on [his] religion." **(Doc. 75, p. 6).** Plaintiff does <u>not</u> take issue with the general requirement that he complete a written request. Rather, he argues the additional mandate that he supply confirmation that his dietary request is a requirement of his religion is an impermissible, substantial burden. **(Doc. 75, p. 7).**

"[I]t is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion." ***School District of Abington Township., Pa. v. Schempp*, 374 U.S. 203, 223 (U.S. 1963);** *see also* ***O'Leary v. Mack*, 80 F.3d 1175, 117-1180 (7th Cir. 1996) (a substantial burden is one that forces one to refrain from religiously motivated conduct, or inhibits or constrains religious conduct or expression).** Thus, plaintiff is correct, insofar as he places the focus on religion, not diet or health. However, plaintiff's focus on the burden of supplying information about and support for his religious requirement ignores the question of whether plaintiff's religious practice has actually been burdened at all. The only relevant religious tenet at issue is abstention form eating the flesh of four-legged animals on Fridays and during Lent (because of plaintiff's failure to exhaust administrative remedies regarding abstention from all meat). Bonnie Sullivan, the Tamms dietician, testified that, if all meat of four-legged animals were skipped, the regular diet would

12

still be nutritionally adequate.  **(Tr. 152).**  Therefore, plaintiff did not require Chaplain Miller's permission and/or the vegan diet in order to be able to comply with his religious beliefs. Any misapplication of  Institutional Directive 04-25-101, § II(I)(3) by Chaplain Miller cannot change the fact that plaintiff's adherence to the Rule of St. Benedict, as he interpreted it, was not impeded or burdened in any way.  Therefore, plaintiff's First Amendment "free exercise" claim must fail.

### RLUIPA and IRFRA

The  Religious Land Use and Institutionalized Persons Act (RLUIPA),42 U.S.C. § 2000cc-1, provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

**42 U.S.C. Section 2000cc-1(a);** *Cutter v. Wilkinson,* **544 U.S. 709, 712 (2005).**

The Illinois Religious Freedom Restoration Act (IRFRA) provides:

> Government may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, unless it demonstrates that application of the burden to the person (i) is in furtherance of a compelling governmental interest and (ii) is the least restrictive means of furthering that compelling governmental interest.

**775 ILCS 35/15.**

Like plaintiff's First Amendment "free exercise" claim, plaintiff's RLUIPA and IRFRA claims are limited to the period he desired to abstain from eating the flesh of four-legged animals on all Fridays and during Lent,  For the same reasons enunciated above, because there was no impediment to plaintiff complying with his religious dietary requirements, the required "substantial burden" is absent and plaintiff's RLUIPA and IRFRA claims fail.

### The Establishment and Equal Protection Clauses

The First Amendment states that "Congress shall make no law respecting an

establishment of religion, or prohibiting the free exercise thereof . . . ." This principle mandates government neutrality with respect to a particular religion, between religion and nonreligion, between different religions, and between sects of a religion. *McCreary County v. American Civil liberties Union*, **545 U.S. 844,___, 125 S.Ct. 2722, 2733 (2005);** *Vision Church v. Village of Long Grove*, **468 F.3d 975, (7th Cir. 2006);** *Kaufman v. McCaughtry*, **419 F.3d 678, 682 (7th Cir. 2005).** "A government policy or practice violates the Establishment Clause if (1) it has no secular purpose, (2) its primary effect advances or inhibits religion, or (3) it fosters an excessive entanglement with religion. *Lemon,* 403 U.S. at 612-13, 91 S.Ct. 2105; *Books v. City of Elkhart,* 235 F.3d 292, 301 (7th Cir.2000)." *Kaufman v. McCaughtry*, **419 F.3d 678, 683 (7th Cir. 2005).** "[A] violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." *School District of Abington Township., Pa. v. Schempp*, **374 U.S. 203, 223 (U.S. 1963).**

The "equal protection" clause protects one from disparate treatment based on membership in a protected class, such as religion. *Greer v. Amesqua,* **212 F.3d 358, 370 (7th Cir. 2000).** For all intents and purposes, plaintiff's establishment clause claim and equal protection claim overlap. *See Conyers v. Abitz*, **416 F.3d 580, (7th Cir. 2005); and** *Graham v. Connor*, **490 U.S. 386, 395 (1989).**

The amended complaint alleges: (1) Muslims and followers of other religions are granted vegan diets as required by their respective religions, while plaintiff has been denied a vegan diet; (2) no pork is served to anyone at Tamms because Muslims and Jews are forbidden by their religions to eat pork; and (3) Chaplain Miller, a Lutheran minister, imposed his own interpretation of Catholic doctrine regarding a vegan diet on plaintiff, over the opinions of other Catholic religious authorities.

Personal involvement is required for liability to attach under 42 U.S.C. § 1983. A defendant must be 'personally responsible for the deprivation of a constitutional right." ' *Sanville v. McCaughtry,* **266 F.3d 724, 740 (7th Cir. 2001),** *quoting Chavez v. Ill. State Police,*

14

**251 F.3d 612, 651 (7th Cir. 2001)**; *see also Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Eades v. Thompson,* 823 F.2d 1055, 1063 (7th Cir. 1987); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir. 1983); *Duncan v. Duckworth,* 644 F.2d 653, 655-56 (7th Cir. 1981). Therefore, plaintiff's claim regarding pork not being served at Tamms fails because the evidence clearly establishes that the decision not to serve any pork or pork by-products was made by the warden of Tamms, not Chaplain Miller.  (*See* **Plaintiff's Exhibit 24).**

Plaintiff's trial brief melds his other two arguments, arguing that Chaplain Miller's preferential treatment of requests for religious accommodation from inmates practicing the Islamic and African Hebrew Israelite faiths violates the "establishment clause." **(Doc. 75, p. 11).** Plaintiff cites: (1) Chaplain Miller's admitted practice of not requiring Muslim and African Hebrew Israelite prisoners to submit verification of their religious dietary requirements, as plaintiff was required to do; and (2) serving extra food to Muslims on their feast days, but refusing to provide plaintiff with extra food for plaintiff to celebrate similar traditional Catholic feasts.

Defendant Chaplain Miller counters that there was no evidence that he made the decision to make the vegan diet available to Muslims; that decision was made by the administration and he did not have authority to override that decision. **(Doc. 74, p. 7).** Chaplain Miller otherwise asserts that there is no evidence plaintiff was treated differently from other Catholics–completely ignoring plaintiff's comparison of his treatment to Muslims and African Hebrew Israelites. **(Doc. 74, p. 7).**

The evidence established that Chaplain Miller merely adopted the practice of automatically giving Muslims and Black/African Hebrew Israelites the vegan diet, as a courtesy and without any additional verification. **(Tr. 27 and 91-92).** However, Chaplain Miller acknowledged that not all Muslims adhere to the dietary requirement of "halal," and he considers that their choice. **(Tr. 93;** *see also* **Tr. 81 (stipulated testimony of Chaplain Haqq)).** Jewish inmates are afforded a similar accommodation relative to a kosher diet. **(Tr. 105).** Miller

acknowledged that in the past he approved vegan diets for Buddhist inmates when a faith representative indicated the inmate would like such a diet and the diet was in line with Buddhism– without requiring a precise statement that the vegan diet was a religious requirement. **(Tr. 100-102).** All of those instances stand in contrast to how plaintiff was required to spar with Chaplain Miller in an effort to persuade him that he qualified for the vegan diet based on his personal religious beliefs. With that said, Chaplain Miller did not violate the equal protection or establishment clauses.

Chaplain Miller explained that it is when he does not know about a particular religion that he seeks verification. **(Tr. 94).** As has already been discussed, there is a neutral reason for requiring an inmate to describe his religious diet and explain how it is a religious requirement (or otherwise central to religious belief or practice). When the proffered explanation is confusing or in contradiction with materials plaintiff himself has submitted (as in this situation), there would be a neutral reason for making additional inquiries of a faith representative or the inmate himself. In this situation, Chaplain Miller did not specifically ask for or require additional information; rather, plaintiff offered it on his own, in an attempt to persuade Miller, only to end up interjecting issues regarding comparisons to monks and the like. **(*See* Plaintiff's Exhibit 10).** Miller has always rested his decision on the information submitted by plaintiff and the apparent inconsistencies between what plaintiff asked for and his proffered reason(s). Thus, any excessive entanglement with religion and impact on plaintiff's religion is incidental to plaintiff's contradictory explanations of the basis for his request for a vegan diet. The notions of neutrality and equality associated with the establishment and equal protection clauses are not offended by Chaplain Miller's implementation of the Institutional Directives. This is because, despite being drawn into a conversation with plaintiff about faith, Miller's decisions to deny plaintiff a vegan diet were based on the confusing and conflicting nature of plaintiff's submissions and statements.

Relative to Chaplain Miller's practice of automatically granting Muslims, Jews and

16

Hebrew Israelites the vegan diet, Chaplain Miller offered a secular rationale based on the impracticality of being able to prepare food in accordance to the religious requirements generally adhered to by those faiths. Those inmates who did not adhere to the traditional dietary requirements of their declared religions were permitted to opt out of the vegan meal plan. That procedure did not advance or inhibit those religions; rather, it was an accommodation that enabled adherents to exercise their freedom of religion– which is permissible. ***See generally Metzl v. Leininger*, 57 F.3d 618, 620 (7th Cir. 1995).** Plaintiff contends he should have been granted the same accommodation. However, during the period he wanted to abstain from eating the flesh of four-legged animals he could achieve that goal while on the regular meal plan. During the later period when plaintiff wanted to abstain from all meat, the religious basis for his dietary request was still not recognized, so the rationale for offering that accommodation was absent. Plaintiff's situation is also not analogous to how Buddhists were treated, in that Chaplain Miller explained that he already knew that some practitioners required a vegan diet while others did not, so he then had a faith representative inquire of the inmate so it could be established whether there was a religious basis for a vegan diet. **(Tr. 100).** Plaintiff was, by all accounts, the first declared Catholic to claim any dietary requirements beyond abstaining from meat on Fridays during Lent, so Chaplain Miller had no base of knowledge upon which to rely. Plaintiff was treated in accordance with the standard practice for nontraditional dietary requests. Again, the notions of neutrality and equality associated with the establishment and equal protection clauses are not offended by Chaplain Miller's implementation of the Institutional Directives.

**IT IS THEREFORE ORDERED** that judgment shall enter in favor of defendant Chaplain Carl Miller as to all claims asserted in the amended complaint, and against plaintiff Brian Nelson.

**IT IS SO ORDERED.**

**DATED: March 31, 2008**

<u>s/ Clifford J. Proud</u>
**CLIFFORD J. PROUD**

**U. S. MAGISTRATE JUDGE**